SVK

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jonathan Ploof,<br><br>v.<br><br>Charles Ryan, et al.,<br>           Defendants. | No. CV 13-0946-PHX-DGC (MHB)<br><br>**ORDER** |

        Plaintiff Jonathan Ploof, an inmate in the custody of the Arizona Department of Corrections (ADC) in Florence, Arizona, filed this *pro se* civil rights action. (Doc. 61, Second Amend. Compl. (SAC).) He raises claims regarding alleged failure to provide him with adequate healthcare and deliberate indifference to the fact that the failure to do so has resulted in significant injury to his heart. On screening pursuant to 28 U.S.C. § 1915A(a), the Court determined that Plaintiff adequately stated an Eighth Amendment claim against Director Charles L. Ryan, Facility Health Administrator and Contract Monitor Matthew A. Musson, and Division Director and Health Services Program Evaluation Administrator Richard Pratt and directed them to answer the Second Amended Complaint. (Doc. 76.)

        Plaintiff has filed a Motion for a Preliminary Injunction seeking a cardiac diet; Defendants oppose the motion. (Docs. 30, 70.) Plaintiff has also filed a Motion for a Preliminary Injunction and a Temporary Restraining Order, claiming that prison officials

are improperly opening, seizing, and delaying delivery of mail marked confidential legal materials.[1] (Doc. 62, 67.) Again, Defendants oppose the Motion. (Doc. 69.)

The Court will deny the motions.

## I. Governing Standards and Analysis

### A. Legal Standard

A preliminary injunction is an extraordinary and drastic remedy and "one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948, pp. 129-130 (2d ed. 1995)). An injunction may be granted only where the movant shows that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). The movant has the burden of proof on each element of the test. *Environmental Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

Under the "serious questions" version of the sliding-scale test, a preliminary injunction is appropriate when a plaintiff demonstrates that "serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1134-35 (9th Cir. 2011), citing *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc). This approach requires that the elements of the preliminary injunction test be balanced, so that a stronger showing of one element may offset a weaker showing of another. "'[S]erious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also

---

[1] Plaintiff has recently filed yet another Motion for Emergency Mandatory Preliminary Injunction, Temporary Restraining Order, which will be addressed by separate order. (Doc. 89.)

shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies*, 632 F. 3d at 1135.

A Request for a Temporary Restraining Order is governed by the same general standards that govern the issuance of a preliminary injunction. *See New Motor Vehicle Bd. v. Orrin W. Fox. Co.*, 434 U.S. 1345, 1347 n. 2 (1977); *Los Angeles Unified Sch. Dist. v. U.S. Dist. Court*, 650 F.2d 1004, 1008 (9th Cir. 1982).

In addition, because the function of a preliminary injunction is to preserve the status quo pending a determination on the merits, *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988), there is heightened scrutiny where the movant seeks to alter rather than maintain the status quo. *Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) (holding that mandatory, as opposed to prohibitory, injunctions are "subject to a heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party").

The Prison Litigation Reform Act also imposes requirements on prisoner litigants who seek preliminary injunctive relief against prison officials. "Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Thus, § 3626(a)(2) limits the court's power to grant preliminary injunctive relief to inmates; "no longer may courts grant or approve relief that binds prison administrators to do more than the constitutional minimum." *Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

**B.     Motion for a Cardiac Diet**

**1.     Parties' contentions**

Plaintiff seeks a cardiac diet, which he asserts has been ordered by an outside cardiac consultant. (Doc. 30.) In January 2014, prison officials proposed a diet that they argue is consistent with Plaintiff's needs; Plaintiff declined the diet. (Doc. 70 at 7.) In his reply to his Motion, Plaintiff claims that the diet was not in fact offered, and he asks the Court to order the approved cardiac diet served at the prison lockdown ward at St.

1  Luke's Hospital, Tempe, Arizona, which Plaintiff contends is consistent with the orders
2  of his prescribing doctors. (Doc. 74 at 10.)

3   Defendants offer the declaration of Barbara Shearer, the ADC liaison between the food contractor, Trinity Food Services Inc. (Trinity), and the company that operates the commissary, and they offer the declaration of Laura Donnelly, a licensed dietician employed by Trinity. (Doc. 70, Ex. A, Shearer Decl. ¶ 3, Ex. B, Donnelly Decl. ¶¶ 1, 2.) The process to obtain a medical diet begins with an order from medical staff of Corizon Health, Inc. (Corizon), which is the contract health-care provider. (Shearer Decl. ¶¶ 3, 4.) Pursuant to ADC food service policies, restricted diets are available for ADC inmates whose medical conditions require specific dietary restrictions to preserve their health and well-being. (Ex. B, Donnelly Decl. ¶ 4.) The policies authorize ADC's medical department personnel to prescribe only the restricted medical diets identified in the ADC's Diet Reference Manual. (*Id*.) If an inmate's medical condition requires dietary restrictions that are not accommodated by the diets listed in ADC's Diet Reference Manual, ADC's medical department must request a dietary consultation with Donnelly before prescribing any such diet. (*Id*.) Donnelly is responsible for designing menus that outline nutritionally adequate meals pursuant to the specifications, directives, and guidelines of the correctional institutions, detention facilities, and government agencies for which Trinity provides food service.

  Defendants assert that when Donnelly receives a request for a dietary consultation, she collaborates with ADC's medical department to formulate a medically appropriate diet and menu. (Donnelly Decl. ¶ 5.) If the diet is not an approved diet, it must be approved by Dr. Williams at Corizon. (Shearer Decl. ¶ 4.) After validating the diet, Shearer enters it into the diet roster system and hand carries a copy of the Restricted Diet Order form, the Diet Card Receipt form, and the Diet Card to the Trinity office. (*Id*.) The Kitchen Supervisor carries the paperwork to the prison unit for delivery to the inmate and to obtain the inmate's signature. (*Id*.) Director Ryan, Richard Pratt, and Matthew Musson are not involved with the medical-diet order process. (*Id*. ¶ 5.)

- 4 -

1    Defendants assert that Plaintiff was admitted to St. Luke's Hospital on October 28,
2    2013 to undergo an angiography. (Doc. 30 at 14-15.) He was discharged on October 29,
3    2013, and his discharge plan included a "[c]ardiac heart healthy 2 gm sodium, low
4    cholesterol diet." (*Id*.) A Renal/Dialysis Diet was written by Dr. Thompson for Plaintiff
5    on November 8, 2012. (Shearer Decl. ¶ 6.) In a November 6, 2013 letter to Shearer,
6    Plaintiff explained that after speaking with Dr. Kumar on March 22, 2012, his
7    cardiologist, Dr. Candipan, on October 28, 2013, and Dr. Byrd on November 5, 2013, the
8    proper diet for him was a "Cardiac Diet." (*Id.* ¶ 8.) He asked to be removed from the
9    Renal Diet and advised that he was going to resolve his diet issue with the federal court.
10   (*Id*.) He was removed from the renal diet.

     On November 20, 2013, Shearer responded to Plaintiff's letter, advising that the Cardiac Diet is similar to the foods served on the Renal Diet, such as lower in fat and sodium and that the Dietician will consult with Plaintiff's Medical Provider to ensure the most effective diet plan is in place. (*Id.* ¶ 10.) Plaintiff sent another letter to Shearer dated November 29, 2013, questioning his receipt of a "Cardiac Diet." (*Id.* ¶ 11.) Shearer then scheduled a telephone conference with Plaintiff to discuss his diet. During the conference, Plaintiff advised Shearer that Family Nurse Practitioner (FNP) Byrd and his doctor on the outside were working on developing a proper diet for him. (*Id*.) Shearer contacted the Health Unit and spoke with Byrd, who advised that she was working with Dietician Donnelly on a proper diet for Plaintiff that would be approved by Dr. Williams. (*Id.* ¶ 12.) FNP Byrd asked Shearer to print out Plaintiff's commissary purchases so she could review his food purchases. (*Id*.)

     On December 23, 2013, Shearer responded to Plaintiff's inmate letter, stating:

> This is in response to your inmate letter Dated 11/29/13. Per our phone conversation on 12/23/13 I need you to talk to your Dr. and get me some guidelines so the Dietician can formulate a new diet for your medical needs. You have stated that your Dr. did not accept the Cardio Diet that we use here. Therefore we need the guidelines from that Dr.

(*Id.* ¶ 14.)

- 5 -

On December 31, 2013, Dr. Williams approved a new Diet Order to provide Plaintiff with a 2-gram-low sodium, low-cholesterol diet. (Shearer ¶ 15.) The diet would expire on December 31, 2014. (*Id*.) On January 6, 2014, Donnelly received a request from the ADC's Eyman Complex medical department for a dietary consultation for Plaintiff, which occurred on January 9. (Donnelly Decl. ¶ 6.) During the consultation, Donnelly discussed and reviewed with the Deputy Warden and a nurse practitioner the progress notes concerning Plaintiff's medical treatment and his lab work. They also reviewed and discussed the dietary restrictions recommended for Plaintiff by an outside medical provider, as well as Plaintiff's commissary food purchases. (*Id*.)

According to Defendants, Plaintiff's lab work and progress notes did not indicate that a 2-gram-sodium, low-cholesterol diet was medically warranted, but the Deputy Warden and nurse practitioner indicated that they were nevertheless inclined to accept the recommendation of the outside medical provider and approve the dietary restrictions to avoid a dispute with Plaintiff. (*Id*. ¶ 7.) Donnelly would formulate a menu that conformed with the recommended dietary restrictions and suggested that someone in the Cook Unit infirmary should counsel Plaintiff about his commissary purchases because most of the food items that he purchased were inconsistent with the recommended dietary restrictions. (*Id*. ¶¶ 7, 14.) Plaintiff disputes this, stating that some items were purchased for a party and his consumption of other items was very infrequent. (Doc. 74 at 7.)

Donnelly subsequently formulated an individually tailored one-week menu for Plaintiff based on the dietary restrictions recommended by his outside medical provider. (Donnelly Decl. ¶ 8, attach. Ex. B.) Although the words "Temporary diet from Medical" appear on the menu, it was not intended as a temporary menu; Donnelly simply neglected to delete the words "Temporary diet from Medical" from a template she used. (*Id*. ¶ 9.) Donnelly's standard practice in situations like this is to initially formulate only a one-week menu because formulating a full six-week cycle individually tailored menu is time consuming and many inmates are terminated from their medical diets after refusing

the meals prepared for them within the first week of an individually tailored menu's implementation. (*Id.* ¶ 10.)

Donnelly asserts that she modeled the menu after ADC's unrestricted regular diet menu as closely as possible because the meals it outlines are generally considered "heart healthy" and contain, on average, less than 400 mg of cholesterol and less than 5 grams of sodium per day. (*Id.* ¶ 12.) Plaintiff's menu, however, substitutes certain items on the regular diet menu, like potato chips, deli meats and fried potatoes, with more complex, high fiber foods, like fruits, vegetables and boiled potatoes, that provide, on average, less than 300 mg of cholesterol, which is considered low under the American Heart Association guidelines, and no more than 2 grams of sodium per day. (*Id.*)

Before forwarding the menu she formulated for Plaintiff to Shearer on January 16, 2014, Donnelly analyzed it using the SQL Food Processor software from the ESHA Corporation of Salem, Oregon to confirm that it: (a) conformed to the dietary restrictions recommended by Plaintiff's outside medical provider; and (b) satisfied the nutritional standards established by the National Academy of Sciences - National Research Council, which serve as the national standard for nutritional guidelines. (*Id.* ¶ 13.) According to Defendants, Plaintiff began receiving a 2-gram sodium, low-cholesterol diet on January 16, 2014. (Shearer Decl. ¶ 16; Donnelly Decl. ¶ 11.) Plaintiff disputes that he ever received the diet, stating that he received only a copy of the proposed diet. (Doc. 74 at 5.)

On January 27, 2014, Plaintiff returned his restricted diet card, noting:

> The Diet Card signed on 12/31/13 was intended as a temporary diet for 1 week until FNP-C K. Byrd could order a "Cardiac Diet" consistent with the treatment plan ordered on 10/28/13 and 12/20/13 and many of the food items on the temp diet would harm my condition, on 1/21/14 FNP-C K Byrd noted a new order for a "Cardiac Diet" was placed, see attached HNR with new order for Cardiac Diet

- 7 -

(Shearer Decl. ¶ 17; Donnelly Decl. ¶ 11.)  Consequently, a full six-week cycle menu was not required because Plaintiff surrendered his restricted diet card and indicated that he did not wish to receive meals prepared in accordance with the menu.  (Donnelly Decl. ¶ 11.)

### 2. Analysis

The Court will deny the motion because Plaintiff cannot show a likelihood of success on the merits of his claim or that serious questions going to the merits were raised.  Nor does he demonstrate that he will suffer immediate irreparable harm without injunctive relief.

First, the Defendants in this case are Ryan, Musson, and Pratt.  Plaintiff's claims against them are that they have a policy and practice of failing to provide him with adequate healthcare and are deliberately indifferent to the fact that the failure to do so has resulted in significant injury to his heart.  (*See* Doc. 76.)  He alleges a practice of failing to provide timely access to health care, deliberate indifference to the risk of harm to Plaintiff from the failure, failing to provide "clear processes that are adhered to," and allowing a "failed system with clear unreasonable delays and refusals to cause current and future heart failure."  He further alleges "failing to provide administrative oversight," which deprives him of proper and adequate medical care, and that Defendants are "deliberately indifferent to the fact that the failure to do so has resulted in significant injury to [Plaintiff]."  Plaintiff asserts that Defendants' "failure to direct by policy and oversight proper medical care" has caused him to experience prolonged and unnecessary pain and suffering.  Plaintiff states that unit health care providers, by policy, are required to submit a referral for "off unit" care to a review board/committee, which he contends is "not for medical reasons," it takes months for the referrals to specialists to be processed, many referrals are denied, and unit medical personnel must then either resubmit the referral or do nothing.  Plaintiff contends that Defendants have failed to create an effective tracking and scheduling system for healthcare appointments, there are lengthy delays in responding to health needs request forms and providing necessary care, and

there are no protocols or timeframes for when he is supposed to receive a face-to-face evaluation or a medical appointment. (*Id.*)

Ryan, Musson, and Pratt do not provide health care nor are they involved in medical diet decisions, and it is unclear how this claim for a medical diet fits into Plaintiff's generalized claims in the SAC. It does not involve a referral or lack of a medical appointment. But even assuming that the medical-diet issue is part of the claims raised in the SAC, Defendants' evidence shows that there is, in fact, a procedure for obtaining a medical diet, including a medical diet that is not one in the Diet Reference Manual. Because there is a procedure and Defendants are not directly involved in creating inmate medical diets, it is unlikely that Plaintiff can show that Defendants were deliberately indifferent to his medical needs through diet policies or decisions.

In addition, Plaintiff fails to offer admissible evidence that the diet proposed by prison officials in January 2014 was medically inadequate. To prevail on a claim under the Eighth Amendment for prison medical care, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A plaintiff must show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain and (2) the defendant's response was deliberately indifferent. *Jett*, 439 F.3d at 1096 (citations omitted). To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

The Court will assume for purposes of the motion that the need for a cardiac diet implicates a serious medical need. But the record here shows that prison officials offered Plaintiff a diet that they determined was a cardiac diet consistent with his needs. Plaintiff's evidence provides only minimal explanation of what his doctors mean by a cardiac diet; specifically, the discharge summary of October 29, 2013 notes cardiac

- 9 -

1  disease and a discharge plan, including "cardiac heart healthy 2 gm sodium, low
2  cholesterol diet." (Doc. 3, Ex. B.)  Defendants assert that the diet planned for Plaintiff
3  meets these requirements. (Donnelly Decl. ¶ 13.) Plaintiff alleges that Bryd did not like
4  Donnelly's proposed diet, but this claim is nothing but unsupported hearsay, and Plaintiff
5  does not identify the perceived problems. (Doc. 74 at 5.) Plaintiff asserts that a cardiac
6  diet is a very specific diet, but he provides no evidence of what his outside doctors
7  actually specified. Thus, although a non-specialist physician's denial of treatment
8  recommendations from specialists may raise triable issues of fact whether that denial was
9  medically unacceptable, *see Snow v. McDaniel*, 681 F.3d 978, 988-89 (9th Cir. 2012), the
10 evidence here does not show that prison officials ignored or denied dietary
11 recommendations. The record shows only that Plaintiff does not agree with the diet
12 proposed. But differences in judgment between an inmate and prison medical personnel
13 regarding an appropriate medical diagnosis or treatment are not enough to establish a
14 deliberate-indifference claim. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). To
15 prevail on a claim involving choices between alternative courses of treatment, a prisoner
16 must show that the course of treatment the doctors chose was medically unacceptable in
17 light of the circumstances and that it was chosen in conscious disregard of an excessive
18 risk to plaintiff's health. *Id*. This generally requires admissible medical evidence from an
19 expert, which Plaintiff does not provide. With his reply, Plaintiff provides what are
20 apparently prison menus and his laboratory results, but without an affidavit or declaration
21 from a medical expert, the Court has no way of assessing the appropriateness of these
22 menus for Plaintiff or the meaning of the lab tests. Likewise, Plaintiff's internet
23 documents are insufficient. Without evidence regarding what Plaintiff's doctors ordered
24 and how, precisely, it differs from the diet proposed by prison officials, Plaintiff cannot
25 show a likelihood of success on the merits or make a showing that he raised serious
26 questions going to the merits.

In addition, the Court will not order Defendants to provide the St. Luke's Hospital diet. Plaintiff provides no evidence what that is and such an order would not comply with the PLRA.

The Court also finds that Plaintiff fails to demonstrate that he will suffer irreparable harm without a Court order. His lack of evidence regarding what, according to his doctors, constitutes an appropriate cardiac diet and his failure to demonstrate that the diet offered by prison officials, which he refused, was medically inadequate are fatal to any showing of irreparable harm.

### C. Motion Regarding the Opening of Mail

In his next motion, Plaintiff claims that prison officials are hindering his attempts to proceed with this litigation because they opened and scanned documents marked "confidential" legal materials. (Doc. 62 at 1.) Specifically, confidential legal materials mailed to Plaintiff by his wife were seized on April 14, 2014, and when Plaintiff complained, were returned on May 2, out of order. (*Id*.) In his supplement, he claims that he is giving his wife power of attorney to act as his agent and conduct legal research on his behalf. (Doc. 67 at 1-2.) He seeks a Temporary Restraining Order and Preliminary Injunction declaring that Defendants' actions violate his rights under the First, Fifth, and Fourteenth Amendments; enjoining Defendants from seizing or scanning his mail marked "legal materials trial prep materials" and ordering Defendants to stop opening such mail unless it is done in his presence.

Defendants assert that under Department Order (DO) 914, *Inmate Mail*, staff can open, inspect, and read incoming mail to prevent criminal activity and the introduction of contraband into the facility. (Doc. 69 at 2.) They provide the declarations, with attachments, of Lieutenant Paul Swaney, who is assigned to the mail and property rooms, and Deputy Warden Ron Lee. (*Id*., Ex. A, Swaney Decl. ¶ 1, Ex. B, Lee Decl. ¶ 1.) Under ADC DO 902, *Inmate Legal Access to the Courts*, effective July 6, 2013, legal mail is defined as "[a]ny letters to or from an inmate's attorney as defined above, or to or from a judge or to or from a court of law." (Swaney Decl. ¶ 4.) On April 14, 2014,

- 11 -

Correctional Officer II Bishop seized the certain property from Plaintiff's incoming mail: 62 pages from WebMD, and 3 pages from another inmate. (*Id.* ¶ 8; Lee Decl. ¶ 5.) Defendants assert that the pages from WebMD were seized in compliance with DO 914.08 at 1.1.21.2 § 1.1.21.3. (*Id.*) The 3 pages from another inmate were seized in compliance with DO 909.07 § 1.3.1.3. (*Id.*)

Plaintiff complained on April 18, and the seized documents were forwarded to ADC's Legal Services Office with a request to determination if Plaintiff could possess the seized documents. (Lee Decl. ¶¶ 6, 7.) The ADC Legal Access Monitor in the Legal Services Office advised that the documents could be released to Plaintiff. (*Id.* ¶ 8.) The seized documents were released to Plaintiff on May 2, 2014. (Swaney Decl. ¶¶ 9-10, Lee Decl. ¶¶ 9-10.) Defendants contend that the documents are numbered and dated and were not returned to Plaintiff in any disarray. (Swaney Decl. ¶ 10.)

An injunction should not issue if it "is not of the same character, and deals with a matter lying wholly outside the issues in the suit." *Kaimowitz v. Orlando, Fla.*, 122 F.3d 41, 43 (11th Cir. 1997)). Plaintiff claims that his legal mail is being tampered with and opened outside his presence are not the claims raised in the SAC. *See Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (an Eighth Amendment claim cannot provide basis for preliminary injunction against alleged acts in retaliation for filing claim). An exception to the general rule exists—"where the preliminary relief is directed to the prisoner's access to the Courts, a nexus between the preliminary relief and the ultimate relief sought is not required." *Prince v. Schriro, et al.*, 2009 WL 1456648, at *4 (D. Ariz. May 22, 2009)),[1] citing *Dimaontiney v. Borg*, 918 F.2d 793, 796 (9th Cir. 1990). But Plaintiff fails to demonstrate any problems that constitute denial of access to the courts. For example, Plaintiff does not claim that he is unable to file necessary pleadings. *See Lewis v. Casey*, 518 U.S. 343, 348-49 (1996) (to establish denial of access

---

[1] *See Prince v. Schriro, et al.*, CV 08-1299-PHX-SRB (JRI) (Doc. 32, Order adopting R & R at Doc. 28).

- 12 -

to the court, inmate must show an "actual injury" resulting from the defendant's actions, such as the inability to meet a filing deadline.) In fact, he admits he received the documents within 17 days.

Because the relief sought is not of the same character, the Court need not determine whether the items were properly seized, but it notes that mail from Plaintiff's wife, who is apparently not an attorney, is not legal mail. *See Keenan v. Hall*, 83 F.3d 1083, 1094 (9th Cir. 1996) ("Mail from the courts, in contrast to mail from a prisoner's lawyer is not legal mail.") And even if prison officials opened legal mail, a single instance of inadvertent opening of legal mail outside an inmate's presence, while not to be condoned, is not actionable as a constitutional violation. *Stevenson v. Koskey*, 877 F.2d 1435, 1441 (9th Cir. 1989).

Thus, Plaintiff has failed to demonstrate his entitlement to either a temporary restraining order or a preliminary injunction.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge as to Plaintiff's Motion for a Preliminary Injunction (Doc. 30) and Plaintiff's Motion for a Preliminary Injunction and a Temporary Restraining Order (Doc. 62) is withdrawn.

(2) Plaintiff's Motion for a Preliminary Injunction (Doc. 30) and Plaintiff's Motion for a Preliminary Injunction and a Temporary Restraining Order (Doc. 62) are **denied**, including his requests for oral argument.

Dated this 28th day of July, 2014.

_____
David G. Campbell
United States District Judge