KAB

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Jonathan Michael Ploof,

    Plaintiff,

v.

Charles L. Ryan, et al.,

    Defendants.

No. CV 13-00946-PHX-DGC (JZB)

**ORDER**

  Plaintiff Jonathan Michael Ploof, who is currently confined in Arizona State Prison Complex-Eyman, brought this civil rights case pursuant to 42 U.S.C. § 1983. (Doc. 61.)  Defendants move for summary judgment, and Plaintiff opposes.[1]  (Docs. 241, 259.)   The Court will grant the motion and dismiss this action.

---

  [1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) regarding the requirements of a response.  (Doc. 243.) Despite the Court's warnings, Plaintiff disregarded the Federal Rules of Civil Procedure, this Court's local rules, and this Court's August 27, 2015 Order in his Response to Defendants' Motion for Summary Judgment.

  Defendants note that Plaintiff failed to follow LRCiv 56.1(b) because, in his separate statement of facts, he did not controvert any of Defendants' facts and failed to support his Response with a corresponding statement of facts.  Indeed, while Plaintiff did file a document he titled "Statement of Facts in Support of the Opposition to Defendants' Motion for Summary Judgment" (Doc. 260), the document merely contains further argument in opposition to Defendants' Motion for Summary Judgment and is not a separate statement of facts in compliance with the rules and this Court's August 27, 2013 Order.  This document merely circumvents this Court's rules setting a page limitation for such responses.

## I.     Background

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated a claim and directed Defendants Ryan, Musson, and Pratt to answer.  The Court dismissed the remaining claims and Defendants.  (Doc. 76.)

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  If the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material (a fact that might affect the outcome of the suit under the governing law), and that the

---

Likewise, Plaintiff attempts to "incorporate by reference" Docs. 61, 76, 89, 115, and 231 in his Response to the Motion for Summary Judgment (Doc. 260 at 25.)  To the extent Plaintiff has cited to specific evidence within those documents to support his Response, the Court has considered that evidence.  But Plaintiff's incorporation by reference of entire documents without specifying what parts of those documents are relevant to the issues currently before the Court is inappropriate and will not be considered by the Court.  It is Plaintiff's obligation to oppose Defendants' arguments, not this Court's obligation to attempt to ascertain what arguments from other motions Plaintiffs may be trying to make.  *See Orr v. Bank of America*, 285 F.3d 764, 775 (9th Cir. 2002) (internal quotation omitted) ("Judges need not paw over the files without assistance from the parties."); *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[J]udges are not like pigs, hunting for truffles buried in briefs.") (citation omitted).

The Court has carefully read Plaintiff's Response to Defendants' Motion for Summary Judgment and his Statement of Facts.  Despite Plaintiff's disregard for this Court's rules and Order, the Court will not, as Defendants' request, consider their facts to be undisputed and admitted (Doc. 269 at 2).  To the extent Plaintiff has failed to cite to specific evidence to rebut Defendants' evidence or has failed to support his own arguments with evidence, however, the Court will assume he cannot do so.

dispute is genuine (the evidence is such that a reasonable jury could return a verdict for the nonmovant). *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); but must "come forward with specific facts showing that there is a genuine issue for trial," *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.  The court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

**III.     Plaintiff's Allegations**

In his Second Amended Complaint, Plaintiff alleged that, while incarcerated at the Arizona State Prison Complex-Eyman, Charles Ryan, Director of the Arizona Department of Corrections (ADC), Richard Pratt, Division Director and Health Services Program Evaluation Administrator, and Matthew A. Musson, the Eyman Complex Health Administrator, were deliberately indifferent to Plaintiff's heart condition because (1) healthcare providers in the prison have a practice of failing to provide timely medical care, which Defendants failed to correct; (2) Defendants have a policy of requiring unit healthcare providers to submit a referral for specialist care to a review board committee, which is not for medical reasons and takes months to process, and, thereafter, the referral requests are unreasonably denied by the committee; (3) Defendants have failed to create an effective tracking and scheduling system for healthcare appointments, there are lengthy delays in responding to health needs requests forms and providing necessary care, and there are no protocols or timeframes for when Plaintiff is to receive a face-to-face medical appointment; and (4) due to these policies, Plaintiff has suffered unreasonable delays and refusals, which cause current and future heart failure.  (Doc. 61.)

/ / /

1    **IV.    Plaintiff's Medical Condition Prior to Incarceration**

2          In March 2003, Plaintiff had heart surgery and had a stent placed in the left

3    anterior descending artery of his heart.  (Doc. 242 ¶ 57.)  On March 31, 2003, Plaintiff

4    was seen by Dr. Kassel of Tri City Cardiology Consultants, who noted that Plaintiff was

5    doing well despite a relatively extensive anterior wall myocardial infarction, and that he

6    had a 60% ejection fraction.  (*Id.* ¶ 58.)  On April 20, 2003, Plaintiff had a Gated

7    Stress/Rest Myocardial Perfusion Scan, which revealed a rest ejection fraction of 50%

8    and a post exercise gated SPECT ejection fraction of 47%.  (*Id.* ¶ 59.)  Plaintiff entered

9    the ADC on April 27, 2005.  (*Id.* ¶ 60.)

10   **V.    Plaintiff's Arguments and Evidence**[2]

11         On November 15, 2005,[3] Plaintiff received a "Communique" from Dr. McRill at

12   ASPC-Eyman stating "In response to [the] HNR dated 11/4/05 requesting 'Heartsmart'

13   diet: the only cardiac diet available here is the low fat, low salt diet that you have already

14   tried.  I will forward your HNR to the FHA's office."[4]   (Doc. 245-3 at 18.)[5]   On

15   _____

16   [2] The Court notes that Plaintiff describes the content of his medical records
     throughout his Response to the Motion for Summary Judgment.  Because the Court
17   considers evidence in determining whether summary judgment is appropriate, the Court
18   does not set forth Plaintiff's characterization of his medical records, but rather sets forth
     the content of the medical records themselves.  Plaintiff's characterizations are often
19   either misleading or incomplete.

20   [3] Plaintiff asserts that his claims against the current Defendants concern medical
21   treatment between August 19, 2011 and the present.  (Doc. 259 at 9.)  The Court
     nonetheless sets forth prior medical history to the extent it is cited by Plaintiff.  To the
22   extent Defendants provide additional medical records detailing Plaintiff's medical
23   treatment prior to August 19, 2011, the Court does not discuss those records because of
     Plaintiff's assertion that his claims arose on August 19, 2011.  *See* Doc. 242 at ¶¶ 61-93
24   (setting forth Plaintiff's medical history prior to August 19, 2011).

25   [4] Plaintiff asserts that Dr. McRill "indicated" that his existing diet provided poor
26   results, Doc. 259 at 7, but that assertion is not supported by Plaintiffs' cited evidence.

27   [5] Unless otherwise specified, all of the Court's citations refer to the automatically
28   generated page numbers of the Court's electronic filing system (CM/ECF), which can be
     found at the top of each filed page.

1   February 6, 2006, D.O. Strubeck noted that Plaintiff "wants a special diet" and noted that

2   he discussed with Plaintiff that he would speak with Central Office about a special diet.

3   (Doc. 245-3 at 20.)

4       On September 19, 2006, Plaintiff was seen by Dr. Boulet at St. Mary's Hospital in

5   Tucson.  (Doc. 231 at 19-20.)  The assessment noted by Dr. Boulet was that Plaintiff had

6   coronary artery disease with intracoronary stenting of his LAD with a negative

7   angiogram performed nine months prior to September 19, 2006; hyperlipidemia with

8   significant hypertriglyceridemia; chronic palpitations; and chronic chest pain.  (*Id.*)  Dr.

9   Boulet recommended a calcium channel blocker, fish oil, an increase in Lipitor, and a

10  follow-up in 6-12 months.  (*Id.*)  Plaintiff asserts he was not seen for this follow-up.

11  Plaintiff also asserts that he was not prescribed lipids as recommended by the doctor.

12      On September 12, 2011, Plaintiff saw PA Salyer and advised him that he was

13  feeling a lot better since starting Imdur and asked to see a cardiologist.  (Doc. 242 ¶ 94.)

14  On October 22, 2011, Salyer submitted an outside consult request for a cardiology

15  appointment for a cardiac catheterization evaluation.  (*Id.* ¶ 95.)  On October 26, 2011,

16  Salyer saw Plaintiff for a cardiac chronic care appointment and noted his stent was stable,

17  but noted crescendo angina and requested an urgent emergency room evaluation.  (*Id.*

18  ¶ 96.)  On October 26, 2011, Plaintiff was seen by Nurse Practitioner Mcelmeel at Tempe

19  St. Luke's Hospital.  (Doc. 231 at 23.)  NP Mcelmeel noted that Plaintiff was being seen

20  after his routine visit with his physician at the ADC regarding ongoing angina and that

21  Plaintiff reported that he had angina on and off for two years, which was managed

22  medically with good relief with titration of his medications.  (*Id.*)  NP Mcelmeel noted

23  that Plaintiff stated that he wanted to go back to the ADC and not get his current workup

24  or angiogram at Tempe St. Luke's because he was expecting a visit from his son on

25  Saturday and would not get the opportunity to see him for another year, and that Plaintiff

26  reported that his chest pain is no different than it ever is.  (*Id.*)  NP Mcelmeel

27  recommended that Plaintiff follow-up with outpatient cardiology for an angiogram,

28  continue all the same medications, and continue cessation of tobacco.  (*Id.* at 25.)

Plaintiff asserts that Mcelmeel's medical record explains "in detail ADC's failures and delays." (Doc. 259 at 12).  Mcelmeel noted that the DOC physician was frustrated with the slow process in coordinating an outpatient workup for Plaintiff and sent him to an inpatient setting to expedite a cardiology referral.  (Doc. 231 at 23.)  Plaintiff appears to assert that he was not provided follow-up treatment as recommended by NP Mcelmeel. (Doc. 259 at 12-13.)

On October 27, 2011, Salyer noted that Plaintiff had returned from Tempe St. Lukes and submitted a consult for a cardiology catheterization lab evaluation.  (Doc. 242 ¶ 98.)

On November 18, 2011, Plaintiff was seen by Dr. Candipan at Phoenix Heart Center. (Doc. 231-1 at 47.)  Dr. Candipan noted that Plaintiff had a history of coronary artery disease, and for the past few months was having symptoms of chest discomfort. (*Id.*)  Dr. Candipan recommended that Plaintiff have a stress test and that his verapamil prescription be increased or that an ACE inhibitor be added.  (*Id.* at 48.)  Plaintiff asserts that Dr. Candipan's orders were not followed.  (Doc. 259 at 13.)  Plaintiff asserts, without citation to evidence, that if a stress test had been performed, it would have shown an 87% blockage to the left side of his heart.  (*Id.*)

On January 26, 2012, Plaintiff was seen by Dr. Kumar at Advanced Cardiac Specialists.  (Doc. 231-2 at 1-3.)   Plaintiff told Dr. Kumar that his chest pain was increasing and he wanted an angiogram and that he had previously told physicians that he could not do any kind of stress test because of a meniscal tear.  (*Id.*)  Dr. Kumar recommended that a coronary angiogram be done and that Plaintiff stop Verapamil, add Norvasc, and continue Atenolol.  (*Id.*)  Plaintiff asserts that he did not receive Norvasc for over a year and points to an HNR and response from prison staff to establish that he did not receive the Norvasc.  (Doc. 245-3 at 38.)   The response indicates that the prescription was filled on March 5, 2013.  (*Id.*)

On February 14, 2012, Plaintiff had a left heart catheterization and PTCA stent placement.  (Doc. 231-2 at 4-7.)  Plaintiff asserts, without citation, that any damage found

during the catheterization was the effect of "delayed treatment." (Doc. 259 at 15.) The impression from the catheterization was "long tubular in-stent narrowing in the proximal left anterior descending artery of approximately 70-80%," presence of an eccentric lesion prior to the stent of approximately 20-30% in the left anterior descending artery, and severe global hypokinesis of the left ventricle. (Doc. 231-2 at 5-6.) After the stent was placed, the resulting luminal narrowing was 0%. (*Id.* at 6.) Dr. Kumar recommended that Plaintiff be placed on Ecotrin and Plavix indefinitely and that Lipitor and Verpamil could continue, but Imdur "may not" be necessary anymore. (*Id.*)

On February 15, 2002, PA Salyer noted that Plaintiff returned from the cardiac catheterization procedure and referred Plaintiff for a post-surgical follow-up appointment and completed an Outside Consultation Request form for a cardiology follow-up for a cardiac stent placement. (Doc. 242 ¶ 102.) On February 16, 2002, Salyer saw Plaintiff for a cardiac chronic care appointment. Plaintiff had no complaints of chest pain, shortness of breath, or palpitations and was provided educations on nutrition, exercise, smoking, and medication management. (*Id.* ¶ 103.) Salyer requested a consult for a bilateral carotid artery ultrasound. (*Id.*)

On March 22, 2012, Plaintiff was again seen by Dr. Kumar. (Doc. 231-2 at 8.) In his assessment and plan, Dr. Kumar noted that Plaintiff was doing extremely well with no more chest pain after a post percutaneous transluminal coronary angioplasty and stent placement in the left anterior descending artery in February 2012, and that Plaintiff had a decreased ejection fraction of approximately 33%. (*Id.*) Dr. Kumar stated that Plaintiff "would like to have his carotid arteries check" and, although no evidence of carotoid bruit was noted on examination, "since the patient is insisting, he will be scheduled for carotoid Doppler ultrasound studies." (*Id.*) Finally, Dr. Kumar stated: "The patient also wants us to recommend a cardiac diet. The patient was recommended a 2-gram sodium, low-cholesterol cardiac diet. However, I am not sure this is available in the prison

1   system." (*Id.*)[6]  Finally, Dr. Kumar stated that Plaintiff "needs a cardiac followup in six

2   months' time," and, at that time, an "echocardiogram may be necessary to reassess the

3   ejection fraction." (*Id.*)

4       On March 26, 2012, PA Salyer submitted an Outside Consult Request for a

5   cardiology follow-up appointment for Plaintiff in six months. (Doc. 242 ¶ 105.)

6       On March 29, 2012, Plaintiff was set to be transported for a cardio-evaluation, but

7   Plaintiff refused transport due to safety concerns. (Doc. 245-2 at 35.)  On April 16, 2012,

8   Plaintiff signed a refusal to follow-up with cardiology due to "abuse at Central Unit."

9   (Doc. 242 ¶ 107.)  A follow-up appointment with the health care provider was scheduled

10  for April 26, 2012. (*Id.*)  On May 2, 2012, it was noted that Plaintiff's blood pressure

11  checks were normal. (*Id.* ¶ 108.)  On June 13, 2012, FNP Linde reviewed Plaintiff's

12  chart and noted the March 22, 2012 recommendation that Plaintiff be provided a low

13  cholesterol, low sodium diet.  FNP noted that because the standard ADC diet is designed

14  to be low in sodium and cholesterol, no further action was needed. (*Id.* ¶ 109.)

15      On June 13, 2012, Defendant Musson responded to a grievance Plaintiff filed

16  stating that he had not received a renal or low fat/salt diet.  In his response, Musson stated

17  that a "low cholesterol and low sodium diet was ordered by the Medical specialist on

18  3/22/12," that the general population diet is "heart healthy" and "meets Plaintiff's needs,"

19  and that the Medical specialist did not indicate that the general population diet was

20  inadequate with regard to cholesterol and sodium. (Doc. 245-3 at 22.)

21      On August 10, 2012, Plaintiff was seen on the nurse's line and claimed that he was

22  120 days overdue for a chronic care visit, that he wanted to be on a renal diet, that he

23  needed a heart cath, and that he needed a special needs order (SNO) renewed.  Plaintiff

24  was referred to the provider. (Doc. 242 ¶ 110.)  On August 13, 2012, FNP Linde noted

25  that Plaintiff was not overdue for a chronic care appointment and he had a pending

26

27

28      [6] Plaintiff asserts that Dr. Kumar "confirms that 'cardiac diets are not available at prison'" (Doc. 259 at 7), but that assertion is not supported by the evidence cited by Plaintiff.

follow-up with cardiology scheduled.  Linde noted that further information about what SNO Plaintiff wanted to renew.  (*Id.* ¶ 111.)  On August 16, 2012, Plaintiff was called to the Health Unit to clarify his renewal for an SNO and Plaintiff asserted that due to his ejection fraction of 35%, he was too tired to walk to chow hall, especially in the heat. His request was referred to the provider.  (*Id.* ¶ 112.)  On August 20, 2012, FNP Linde reviewed Plaintiff's request and noted that Plaintiff had not reported shortness of breath to the cardiologist on March 22, 2012, that Plaintiff refused a cardiology follow-up on April 16, 2012, that Plaintiff's ejection fraction was expected to improve, and that there was no indication for a short distance walking pass.  (*Id.* ¶ 113.)  Linde denied Plaintiff's request for a short distance walking pass and renewed an SNO for no repetitive bending/twisting of his left knee and limited work capacity.  (*Id.*)

On November 8, 2012, Dr. Thompson saw Plaintiff for a cardiovascular chronic care appointment and noted that Plaintiff's hypertension was "good" and his lipids were poor.  Dr. Thompson ordered a renal diet.  (*Id.* ¶ 114.)  On January 24, 2013, Dr. Thompson completed a Referral Request seeking a cardiology re-evaluation of Plaintiff. (*Id.* ¶ 115.)  On February 27, 2013, Dr. Thompson saw Plaintiff for a cardiovascular chronic care appointment and noted fair control of Plaintiff's hypertension, lipids, angina and poor control of his coronary artery disease.  Dr. Thompson increased Plaintiff's prescriptions for Pravastatin and prescribed Norvasc and requested a follow-up with cardiology. (*Id.* ¶ 116.)

On March 19, 2013, Plaintiff was seen by Dr. Mhatre at Tempe St. Luke's Hospital, who noted that Plaintiff denied any overt chest pain, but complained of intermittent pressure and fatigue. (Doc. 231-2 at 12.)  Dr. Mhatre noted that Plaintiff was on "appropriate medical therapy, including beta-blocker and aspirin," and recommended that Plaintiff start Lipitor, Coreg, discontinue atenolol, start Lisinopril, get a repeat echocardiogram and myocardial perfusion study to evaluate ongoing ischemia.  (Doc. 231-2 at 12-13.)  Dr. Mhatre wanted to follow-up in two months after he received the results of the two tests.  (*Id.*)

On March 22 and 28, 2013, Dr. Thompson created paperwork to refer Plaintiff for a "repeat echo, myocardial perfusion study poss: Defebrillate." (Doc. 242 ¶ 118.) On April 8, 2013, Dr. Thompson gave verbal orders to discontinue Plaintiff's Lipitor 40 mg and Pravastatin 20 mg, but prescribed that 80 mg Pravastatin be taken at bedtime. (*Id.* ¶ 119.) On April 11, 2013, Dr. Thompson discontinued Pravastatin and prescribed Lipitor 40 mg daily. (*Id.* ¶ 20.)

On May 7, 2013, Dr. Mhatre preformed a Lexiscan Stress Test, which was negative for ischemia and noted he was awaiting myocardial perfusion imaging. (Doc. 231-2 at 27.)

On May 15, 2013, Plaintiff was seen, the results of his Lexican Stress Test were discussed, and his coronary artery disease was assessed as stable, with an improved ejection fraction. (Doc. 242 ¶ 124.) On July 11, 2013, Plaintiff was seen for a coronary artery disease chronic care appointment. (*Id.* ¶ 125.) On July 11, 2013, Plaintiff was seen by PA Salyer for a follow-up of his coronary artery disease. It was noted Plaintiff would need an ECG for his cardiology appointment and Salyer submitted a consultation request for a Carotid Doppler Ultrasound study and a cardiology follow-up for atherosclerotic heart disease cardiomyopathy. (*Id.* ¶¶ 126, 127.) On July 16, 2013, Nurse Practitioner Houdeshal noted that Plaintiff's EKG did not show any ischemic changes. (*Id.* ¶ 128.) On July 24, 2013, an anteroposterior/posteroanterior chest x-ray was taken of Plaintiff and revealed "no evidence of active pulmonary parenchymal or pleural disease process" and a "cardiovascular silhouette with normal limits." (Doc. 242 ¶ 129[7]; Doc. 242-5 at 12.) On August 8, 2013, Plaintiff was called to the Health Unit to discuss his diet and was told the ADC diet is designed to be heart healthy. Plaintiff said he understood, but reaffirmed that he wanted a cardiac diet. (*Id.* ¶ 130.) On August 20, 2013, Plaintiff underwent a real time Spectral waveforms and color Doppler evaluation of the cartoid arteries, bilaterally. (*Id.* ¶ 131.)

---

[7] There is an error in the date of this x-ray in Defendants' Statement of Facts. (*See* Doc. 242 at ¶ 129 (stating that x-ray was performed on July 24, 2003).)

1     On August 20, 2013, Plaintiff was seen by Dr. Saad Alsaab at Tempe St. Luke's
2  Hospital and complained of chest pain.  (Doc. 231-2 at 40-41.)  Dr. Alsaab noted that
3  Plaintiff's last echo showed a normal function, his last stress test showed an ejection
4  fraction of 44%, and that Plaintiff was not a candidate for ICD or defibrillator.  (*Id.*)  Dr.
5  Alsaab recommended left heart catheterization.    (*Id.*)    Plaintiff asserts that as of
6  August 20, 2013, he had not been provided Lisinopril or Coreg as recommended by Dr.
7  Mhatre on March 19, 2013, and that such delay was for "non-medical reasons."
8  (Doc. 259 at 18.)

9     On August 22, 2013, a Consult Request was submitted for a left heart
10  catheterization.  (Doc. 242 ¶ 133.)  On September 18, 2013, Plaintiff was seen for a
11  cardiac chronic care visit and stated that he felt like his arteries were clogging, he was
12  having daily chest pains, and he wanted to go back on a renal diet, but only to eat lunch.
13  An examination of Plaintiff revealed regular heart rhythm and a fair degree of
14  cardiovascular control.  (*Id.* ¶ 134.)

15     On October 28, 2013, Plaintiff was seen by Dr. Candipan at St. Luke's Medical
16  Center for a left heart catheterization, left ventricular angiography, selective coronary
17  angiography, and percutaneous coronary intervention and placement of a drug-eluting
18  stent in the proximal left anterior descending artery.  (Doc. 231-2 at 45-46.)  NP
19  Mcelmeel at Tempe St. Luke's Medical Center noted that Plaintiff should follow up with
20  Dr. Khan in the ADOC clinic in 2 to 4 weeks, that Plaintiff should continue his Plavix
21  and statin therapy, continue his carvedilol, amlodipine, Lisinopril, and Imdur, that
22  Plaintiff should quit smoking, and that Plaintiff be given a heart healthy diet of 2 grams
23  sodium and low cholesterol.  (Doc. 231-3 at 1-2.)

24     On October 30, 2013, Plaintiff was seen for a post-op examination.  Plaintiff felt
25  more energetic and no longer felt like he had an elephant on his chest.  Plaintiff was
26  given a "stent card" and a diet was ordered.  (Doc. 242 ¶ 136.)

27     On December 10, 2013, Plaintiff was seen by Dr. Khan at Tempe St. Luke's
28  Hospital and reported a chest burning sensation.  (Doc. 231-3 at 14-15.)  Dr. Khan

1    recommended an increase in Imdur, continuation of aspirin, Plavix, and a beta-blocker,
2    and a follow-up in 3 to 4 weeks.  (*Id.*)  Plaintiff asserts he never received a follow-up.
3    (Doc. 259 at 19.)

4         On December 16, 2013, a consult request was submitted for a cardiology consult.
5    (Doc. 242 ¶ 138.)

6         On February 17, 2014, Plaintiff was seen for complaints of chest pain, but denied
7    pain at the time of the visit.  Plaintiff was told to quit smoking.  (*Id.* ¶ 139.)  On
8    February 22, 2014, Plaintiff was seen at the health unit for a follow-up and asserted he
9    was experiencing increasing episodes of chest pain, but denied chest pain during the visit.
10   (*Id.* ¶ 140.)  Plaintiff reported that he had a one week trial diet, but he did not like his
11   choices, so he did not choose anything.  The medical record noted that Plaintiff chose
12   high fat, high sodium items when he made purchases from the store.  A cardiology
13   consult was requested and Plaintiff was encouraged to try the ordered diet.  (*Id.*)

14        On March 18, 2014, Plaintiff saw Dr. Candipan at Tempe St. Luke's Hospital for a
15   follow-up regarding coronary artery disease.  (Doc. 231-3at at 31-32.)  Dr. Candipan
16   noted that an EKG was done that day, which revealed normal sinus rhythm with evidence
17   of a prior anteroseptal infarction, and recommended that a Lexiscan stress test be done
18   in "the near future."  (*Id.*)

19        On March 31, 2014, a consultation request for a Lexiscan stress test was submitted
20   for Plaintiff.  (Doc. 242 ¶ 143.)  On May 6, 2014, Plaintiff was seen by PA Ainslie to
21   review his March 18, 2014 cardiology consult with Dr. Candipan.  Plaintiff was assessed
22   with ischemic heart disease and the plan was for Plaintiff to undergo the Lexiscan stress
23   test.  (*Id.* ¶ 144.)  Plaintiff was given a stress test on May 20, 2014, which showed angina
24   with no evidence of ischemia.  (Doc. 231-3 at 36.)

25        On July 31, 2014, Plaintiff was seen by NP McKamey for complaints of knee
26   pain.  McKamey went over Plaintiff's lab and stress test reports with him and wrote a
27   request for a cardiology consult.  (Doc. 242 ¶ 146.)  On August 23, 2014, a Consultation
28   Request was submitted for a left heart cath for Plaintiff.  (*Id.* ¶ 147.)  On September 4,

2014, Plaintiff was seen by nursing staff requesting counseling for chest pain.  Clinical Coordinator Johnson was contacted and a cardiology consult was approved.  (*Id.* ¶148.)

On October 21, 2014, Plaintiff was seen by Dr. Makki at Tempe St. Luke's Hospital.  Dr. Makki recommended that Plaintiff start Ranexa, increase his Lisinopril, continue aspirin and Plavix and follow-up in one month.  (Doc. 231-3 at 36.)  Plaintiff asserts that Dr. Makki's orders were "disregarded." (Doc. 259 at 21.)

On October 22 and 24, 2014, Plaintiff's cardiology report was reviewed and it was noted that Ranexa 500 twice a day was to be started.  A call was placed to the cardiologist and it was verified that Imdur was to be discontinued  Staff were going to recheck the cardiologist's order for fish oil.  (Doc. 242 ¶ 151.)  On October 29, 2014, a Consultation Request for a cardiology consult was submitted for a follow-up with Dr. Makki.  (*Id.* ¶ 152.)

On November 13, 2014, Plaintiff was seen by NP Mulhern and claimed that the cardiologist did not go over the changes in his treatment at the October 21, 2014 appointment.  (*Id.* ¶ 153.)  The cardiology consult was discussed and Plaintiff asserted that he did not think Imdur should be discontinued, so another call was placed to the cardiologist.  Plaintiff asserted that because he was not on a heart healthy diet, he was only eating one meal a day and NP Mulhern told Plaintiff that was not healthy.  (*Id.*)  Examination revealed that Plaintiff was not in acute distress and his heart had a regular rate and rhythm.  Cardiology was to be called regarding his medication and his diet was to be discussed with health unit staff.  (*Id.*)  On November 14, 2014, NP Mulhern contacted the cardiologist, who affirmed that Imdur should be discontinued.  Ranexa was changed to keep on person and the FHA was going to check for past diet information on Plaintiff.  (*Id.* ¶ 154.)  On December 5, 2014, Plaintiff was scheduled for the chronic care line.  "Time lab work" was ordered and medications were reviewed.  (*Id.* ¶ 155.)

On December 13, 2014, Plaintiff was seen at the Health Unit for complaints of chest pain, and Plaintiff was authorized to go to the hospital.  He was later admitted to Mountain Vista Medical Center.  (*Id.* ¶ 156; Doc. 231-3 at 40.)  Plaintiff reported that

Ranexa did not work and requested Imdur.  (*Id.*)  A stress test was done, which showed an area of significant reversible ischemia and a cardiac catheterization was done, which did not reveal any acute abnormality.  (*Id.* at 45, 50-51.)  Plaintiff's ejection fraction was around 30% to 35%.  (Doc. 231-4 at 23.)  It was recommended that Imdur be added and that Plaintiff continue Ranexa.  (Doc. 231-3 at 51.)

On January 2, 2015, Plaintiff was seen by NP Mulhern for complaints of chest pain and was advised that he had an ejection fraction in the 30s.  (Doc. 242 ¶ 158.) Plaintiff said he would not go to the hospital and just wanted staff to know that he was experiencing chest pain.  Examination revealed that Plaintiff was alert and oriented times three, was not in acute distress, and his heart had a regular rate and rhythm.  (*Id.*)  Dr. Rispin advised that Plaintiff's vitals should be checked, Plaintiff could be given up to three Nitroglycerin, and if Plaintiff's chest pain resolved, he could return to the housing unit.  (*Id.*)

On February 17, 2015, Plaintiff was seen by Dr. Makki at Tempe St. Luke's Hospital.  (Doc. 231-4 at 23.)  Dr. Makki recommended that Plaintiff resume isosorbide mononitrate and Ranexa and a MUGA scan to make sure that Plaintiff's ejection fraction was 40 or better.  (*Id.*)  Dr. Makki stated that if the ejection fraction was not 40 or better, Plaintiff would need an automatic implantable cardioverter defibrillator.  (*Id.*)  Dr. Makki stated that Plaintiff should follow-up in 2 to 4 weeks.  (*Id.*)  An ADOC Clinic Progress note indicated that Plaintiff was not on Ranexa because it was not covered by Corizon. (Doc. 231-4 at 27.)

On July 15, 2015, Plaintiff submitted an Inmate Informal Complaint Resolution complaining that he was without Ranexa from June 30, 2015 through July 8, 2015, and received a response from COIII Beauregard explaining that the non-formulary medication went through an approval process and would be submitted sooner to avoid delay in the future.  (Doc. 245-4 at 1-3.)

On April 21, 2015, Plaintiff was seen by Dr. Makki at Tempe St. Luke's Hospital regarding follow-up on his angina and ischemic cardiomyopathy.  (Doc. 245-3 at 27.)

1   Plaintiff reported to Dr. Makki that his meals at the prison are not cardiac friendly and, as

2   a result, Dr. Makki recommended that Plaintiff should be on a cardiac diet, including

3   salads and lean meat to prevent any progression of his coronary artery disease.  (*Id.*)

4   Plaintiff asserts that the only meats he receives are processed lunch meats and does not

5   receive any unprocessed chicken or lean meat and that all menu items contain sodium.

6   (Doc. 259 at 24.)

7   In response to Plaintiff's July 19, 2015 grievance requesting a "cardiac diet,"

8   Registered Nurse Croadsdale responded that "DOC does not offer a low sodium or

9   cardiac diet."  (Doc. 245-3 at 30.)

10   Based on the above cited medical records, Plaintiff argues that his constitutional

11   rights have been violated because it is the "practice of the ADC . . . that if dietary

12   requirements are outside the norm[,] it[']s not to be provided," and that Plaintiff is told by

13   the ADC that the existing diet is heart healthy "d[e]spite orders contradicting this fact

14   from cardiac doctors for years."  (Doc. 259 at 7-8.)  Plaintiff further argues that he

15   experienced delays in cardiac care.  *See generally id.*

16   Plaintiff asserts that Defendants' actions caused him injury because he was

17   advised on March 19, 2015 that "delayed treatment over 1 year" caused him "extensive

18   damage."  (Doc. 259 at 9.)  To support this alleged injury, Plaintiff cites a January 26,

19   2013 medical record from Dr. Kumar at Advanced Cardiac Specialists and March 19,

20   2013 medical record from Tempe St. Luke's Hospital, Doc. 259 at 9 (citing Doc. 231-2 at

21   1-3 and 12), but those medical records do not support Plaintiff's claim that he was

22   informed that delayed treatment for over a year caused extensive damage.[8]

23   ────────────────

24   [8] Defendants' objections to Plaintiff's evidence on hearsay grounds are overruled.

25   *See Quanta Indemnity Co. v. Amberwood Dev. Inc.*, No. CV 11-1807-PHX-JAT, 2014
    WL 1246144, at *2 (D. Ariz. March 26, 2014) (material in a form not admissible in

26   evidence, but which could be produced in a form admissible at trial, may be used to
    *avoid*, but not *obtain* summary judgment) (citing cases).  Moreover, Defendants object to

27   Dr. Cohen's report, in part, because Plaintiff has failed to show that it has relevance to his
    medical claims.  Plaintiff asserts that Cohen "must be questioned" to determine whether

28   he considered Plaintiff's medical records in making his report.  (*See* Doc. 260 at 7.)  The

## VI.   Discussion

To state an Eighth Amendment claim, plaintiffs must meet a two-part test. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). "First, the alleged constitutional deprivation must be, objectively, sufficiently serious," and the "official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Id.* at 834 (internal quotations omitted).   Second, the prison official must have a "sufficiently culpable state of mind" – he must act with "deliberate indifference to inmate health or safety." *Id.* (internal quotations omitted).  In defining "deliberate indifference" in this context, the Supreme Court has imposed a subjective test: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* at 837 (emphasis added).

An inadvertent failure to provide adequate medical care or negligence in diagnosing or treating a medical condition does not support an Eighth Amendment claim. *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citations omitted).  Further, a mere difference in medical opinion does not establish deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

Finally, even if deliberate indifference is shown, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096

Plaintiff alleges that Defendants have authority to create policy for the Arizona Department of Corrections.  Plaintiff does not argue that Defendants directly violated his constitutional rights, but rather that they either failed to enact policies to protect his constitutional rights, or that they allowed a custom of inadequate healthcare to continue

---

opportunity for Plaintiff to conduct discovery and question Dr. Cohen has passed.  To the extent Plaintiff claims that Dr. Cohen examined his medical records, such claim is mere speculation is not supported by evidence.

With regard to Defendants' other objections, the Court has considered the remainder of Plaintiff's arguments and evidence despite those objections.  The Court will thus neither overrule nor sustain those objections at this time.

knowing that the ADC was not providing adequate healthcare, and failed to act to correct the custom.

Thus, Plaintiff must show: (1) that his Eighth Amendment rights were violated by an employee or employees of the ADC; (2) that Defendants have customs or policies that amount to deliberate indifference; and (3) that the policies or customs were the moving force behind the violation of Plaintiff's constitutional rights in the sense that Defendants could have prevented the violation with an appropriate policy. *See Gibson v. County of Washoe*, 290 F.3d 1175, 1193-94 (9th Cir. 2002). "Policies of omission regarding the supervision of employees . . . can be policies or customs that create . . . liability . . . , but only if the omission reflects a deliberate or conscious choice to countenance the possibility of a constitutional violation." *Id.* at 1194 (quotations omitted).

As noted above, Plaintiff specifically alleged in his Second Amended Complaint that Defendants failed to enact policies to ensure that he was provided timely medical care, and that Defendants' policy of requiring unit healthcare providers to submit a referral for specialist care to a review board committee caused unreasonable delay, and that the review board committee unreasonably denies such referrals. Plaintiff alleged that, because of these policies, he has suffered unreasonable delays and refusals, which are causing his current and future heart failure.[9]

/ / /

---

[9] Defendants argue that they have delegated the responsibility for healthcare to medical providers, that they do not create medical policies and are not responsible for such policies, and, as a result, that summary judgment should be granted in their favor. Similar arguments have been rejected in this Circuit. *See Long v. County of Los Angeles*, 442 F.3d 1178, 1187 (9th Cir. 2006) ("even where trained professionals are involved, a plaintiff is not foreclosed from raising a genuine issue of triable fact regarding municipal liability when evidence is presented which shows that the municipality's failure to train its employees amounts to deliberate indifference. Indeed, the County's argument would allow municipalities to insulate themselves from liability for failing to adopt needed policies by delegating to trained personnel the authority to decide all such matters on a case by case basis, and would absolve the governmental agencies of any responsibility for providing their licensed or certified teachers, nurses, police officers and other professionals with the necessary additional training required to perform their particular assignments or to implement the agency's specific policies.").

### A.    Delay in Treatment and Medications

Plaintiff argues that recommended follow-up appointments were delayed and the receipt of certain prescribed medications was delayed.  In support of his argument that recommended follow-ups were delayed, Plaintiff offers medical records showing when a follow-up was recommended, and other medical records showing that the follow-up occurred outside the recommended time frame.  In support of his argument that recommended medications were delayed, Plaintiff offers evidence showing that there were delays between the time certain medications were prescribed and when Plaintiff actually received those medications.

The record does contain evidence of delays in receiving medication and follow-up care, but Plaintiff does not offer specific evidence for each occasion he claims there was a delay showing that the delays could be attributed to failure to enact a proper policy or that the delays were the result of deliberate indifference to his serious medical needs. Moreover, while Plaintiff alleges that he has suffered harm in terms of his worsening condition, he has not produced any admissible evidence that his condition stems from any delay that he has experienced.  *See, e.g.*, *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful); *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990) (a delay in treatment does not constitute an eighth amendment violation unless it causes harm).  The evidence shows that Plaintiff had serious heart problems before he was incarcerated, that he was counseled several times during his incarceration to stop smoking, and that he failed on some occasions to choose healthy foods.  Plaintiff has not shown that any progression of his heart disease was due to delays in appointments or medications as opposed to progression of his pre-existing disease or these other factors. Speculative and conclusory allegations are insufficient to overcome summary judgment. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat

1    summary judgment").  The record shows that Plaintiff received consistent medical care

2    related to his heart condition and, while that care may not have been ideal, Plaintiff has

3    not shown that the delays resulted from deliberate indifference or caused his current and

4    future condition.

5        **B.    Diet**

6        Plaintiff previously sought a preliminary injunction seeking a cardiac diet.  In its

7    Order denying Plaintiff's motion or a preliminary injunction, the Court stated the facts as

8    follows:[10]

> Plaintiff seeks a cardiac diet, which he asserts has been
> ordered by an outside cardiac consultant.  (Doc. 30.)   In
> January 2014, prison officials proposed a diet that they argue
> is consistent with Plaintiff's needs; Plaintiff declined the diet.
> (Doc. 70 at 7.)  In his reply to his Motion, Plaintiff claims that
> the diet was not in fact offered, and he asks the Court to order
> the approved cardiac diet served at the prison lockdown ward
> at St. Luke's Hospital, Tempe, Arizona, which Plaintiff
> contends is consistent with the orders of his prescribing
> doctors.  (Doc. 74 at 10.)

> Defendants offer the declaration of Barbara Shearer,
> the ADC liaison between the food contractor, Trinity Food
> Services Inc. (Trinity), and the company that operates the
> commissary,  and they offer the declaration of Laura
> Donnelly, a licensed dietician employed by Trinity. (Doc. 70,
> Ex. A, Shearer Decl. ¶ 3, Ex. B, Donnelly Decl. ¶¶ 1, 2.) The
> process to obtain a medical diet begins with an order from
> medical staff of Corizon Health, Inc. (Corizon), which is the
> contract health-care provider.   (Shearer Decl. ¶¶ 3, 4.)
> Pursuant to ADC food service policies, restricted diets are
> available for ADC inmates whose medical conditions require
> specific dietary restrictions to preserve their health and well-
> being. (Ex. B, Donnelly Decl. ¶ 4.)  The policies authorize
> ADC's medical department personnel to prescribe only the
> restricted medical diets identified in the ADC's Diet
> Reference Manual.  (*Id.*)  If an inmate's medical condition

_____

[10] The parties used the same facts and evidence in support of their arguments
regarding the motion for preliminary injunction as they use in support of their arguments
in support of summary judgment.

requires dietary restrictions that are not accommodated by the diets listed in ADC's Diet Reference Manual, ADC's medical department must request a dietary consultation with Donnelly before prescribing any such diet. (*Id*.) Donnelly is responsible for designing menus that outline nutritionally adequate meals pursuant to the specifications, directives, and guidelines of the correctional institutions, detention facilities, and government agencies for which Trinity provides food service.

Defendants assert that when Donnelly receives a request for a dietary consultation, she collaborates with ADC's medical department to formulate a medically appropriate diet and menu. (Donnelly Decl. ¶ 5.) If the diet is not an approved diet, it must be approved by Dr. Williams at Corizon. (Shearer Decl. ¶ 4.) After validating the diet, Shearer enters it into the diet roster system and hand carries a copy of the Restricted Diet Order form, the Diet Card Receipt form, and the Diet Card to the Trinity office. (*Id*.) The Kitchen Supervisor carries the paperwork to the prison unit for delivery to the inmate and to obtain the inmate's signature. (*Id*.) Director Ryan, Richard Pratt, and Matthew Musson are not involved with the medical-diet order process. (*Id*. ¶ 5.)

Defendants assert that Plaintiff was admitted to St. Luke's Hospital on October 28, 2013 to undergo an angiography. (Doc. 30 at 14-15.) He was discharged on October 29, 2013, and his discharge plan included a "[c]ardiac heart healthy 2 gm sodium, low cholesterol diet." (*Id*.) A Renal/Dialysis Diet was written by Dr. Thompson for Plaintiff on November 8, 2012. (Shearer Decl. ¶ 6.) In a November 6, 2013 letter to Shearer, Plaintiff explained that after speaking with Dr. Kumar on March 22, 2012, his cardiologist, Dr. Candipan, on October 28, 2013, and Dr. Byrd on November 5, 2013, the proper diet for him was a "Cardiac Diet." (*Id*. ¶ 8.) He asked to be removed from the Renal Diet and advised that he was going to resolve his diet issue with the federal court. (*Id*.) He was removed from the renal diet.

On November 20, 2013, Shearer responded to Plaintiff's letter, advising that the Cardiac Diet is similar to the foods served on the Renal Diet, such as lower in fat and

sodium and that the Dietician will consult with Plaintiff's Medical Provider to ensure the most effective diet plan is in place. (*Id.* ¶ 10.)  Plaintiff sent another letter to Shearer dated November 29, 2013, questioning his receipt of a "Cardiac Diet."  (*Id.* ¶ 11.)  Shearer then scheduled a telephone conference with Plaintiff to discuss his diet.  During the conference, Plaintiff advised Shearer that Family Nurse Practitioner (FNP) Byrd and his doctor on the outside were working on developing a proper diet for him.  (*Id.*)  Shearer contacted the Health Unit and spoke with Byrd, who advised that she was working with Dietician Donnelly on a proper diet for Plaintiff that would be approved by Dr. Williams. (*Id.* ¶ 12.)  FNP Byrd asked Shearer to print out Plaintiff's commissary purchases so she could review his food purchases. (*Id.*)

On December 23, 2013, Shearer responded to Plaintiff's inmate letter, stating:

This is in response to your inmate letter Dated 11/29/13. Per our phone conversation on 12/23/13 I need you to talk to your DR. and get me some guidelines so the Dietician can formulate a new diet for your medical needs. You have stated that your Dr. did not accept the Cardio Diet that we use here. Therefore we need the guidelines from that Dr.
(*Id.* ¶ 14.)

On December 31, 2013, Dr. Williams approved a new Diet Order to provide Plaintiff with a 2-gram-low sodium, low-cholesterol diet. (Shearer ¶ 15.)  The diet would expire on December 31, 2014. (*Id.*)  On January 6, 2014, Donnelly received a request from the ADC's Eyman Complex medical department for a dietary consultation for Plaintiff, which occurred on January 9.  (Donnelly Decl. ¶ 6.)  During the consultation, Donnelly discussed and reviewed with the Deputy Warden and a nurse practitioner the progress notes concerning Plaintiff's medical treatment and his lab work. They also reviewed and discussed the dietary restrictions recommended for Plaintiff by an outside medical provider, as well as Plaintiff's commissary food purchases. (*Id.*)

According to Defendants, Plaintiff's lab work and progress notes did not indicate that a 2-gram-sodium, low-cholesterol diet was medically warranted, but the Deputy

Warden and nurse practitioner indicated that they were nevertheless inclined to accept the recommendation of the outside medical provider and approve the dietary restrictions to avoid a dispute with Plaintiff.   (*Id.* ¶ 7.)   Donnelly would formulate a menu that conformed with the recommended dietary restrictions and suggested that someone in the Cook Unit infirmary should counsel Plaintiff about his commissary purchases because most of the food items that he purchased were inconsistent with the recommended dietary restrictions. (*Id.* ¶¶ 7, 14.)   Plaintiff disputes this, stating that some items were purchased for a party and his consumption of other items was very infrequent.  (Doc. 74 at 7.)

Donnelly subsequently formulated an individually tailored one-week menu for Plaintiff based on the dietary restrictions recommended by his outside medical provider. (Donnelly Decl. ¶ 8, attach. Ex. B.)   Although the words "Temporary diet from Medical" appear on the menu, it was not intended as a temporary menu; Donnelly simply neglected to delete the words "Temporary diet from Medical" from a template she used.  (*Id.* ¶ 9.)   Donnelly's standard practice in situations like this is to initially formulate only a one-week menu because formulating a full six-week cycle individually tailored menu is time consuming and many inmates are terminated from their medical diets after refusing the meals prepared for them within the first week of an individually tailored menu's implementation.  (*Id.* ¶ 10.)

Donnelly asserts that she modeled the menu after ADC's unrestricted regular diet menu as closely as possible because the meals it outlines are generally considered "heart healthy" and contain, on average, less than 400 mg of cholesterol and less than 5 grams of sodium per day.  (*Id.* ¶ 12.)   Plaintiff's menu, however, substitutes certain items on the regular diet menu, like potato chips, deli meats and fried potatoes, with more complex, high fiber foods, like fruits, vegetables and boiled potatoes, that provide, on average, less than 300 mg of cholesterol, which is considered low under the American Heart Association guidelines, and no more than 2 grams of sodium per day. (*Id.*)

Before forwarding the menu she formulated for Plaintiff to Shearer on January 16, 2014, Donnelly analyzed it using the SQL Food Processor software from the ESHA

Corporation of Salem, Oregon to confirm that it: (a) conformed to the dietary restrictions recommended by Plaintiff's outside medical provider; and (b) satisfied the nutritional standards established by the National Academy of Sciences - National Research Council, which serve as the national standard for nutritional guidelines.  (*Id*. ¶ 13.) According to Defendants, Plaintiff began receiving a 2-gram sodium, low-cholesterol diet on January 16, 2014. (Shearer Decl. ¶ 16; Donnelly Decl. ¶ 11.) Plaintiff disputes that he ever received the diet, stating that he received only a copy of the proposed diet.  (Doc. 74 at 5.)

On January 27, 2014, Plaintiff returned his restricted diet card, noting:

The Diet Card signed on 12/31/13 was intended as a temporary diet for 1 week until FNP-C K. Byrd could order a "Cardiac Diet" consistent with the treatment plan ordered on 10/28/13 and 12/20/13 and many of the food items on the temp diet would harm my condition, on 1/21/14 FNP-C K Byrd noted a new order for a "Cardiac Diet" was placed, see attached HNR with new order for Cardiac Diet

(Shearer Decl. ¶ 17; Donnelly Decl. ¶ 11.)  Consequently, a full six-week cycle menu was not required because Plaintiff surrendered his restricted diet card and indicated that he did not wish to receive meals prepared in accordance with the menu.  (Donnelly Decl. ¶ 11.)

(Doc. 106 at 3-8; *see* Doc. 242 ¶¶ 159-193.)

Plaintiff asserts that Dr. Makki recently recommended that Plaintiff be on a diet consisting of lean meats and salads, but that he is not given that diet because ADC does not offer a "cardiac diet."

As the Court noted in ruling on Plaintiff's Motion for Preliminary Injunction, Plaintiff did not plead claims relating to an inadequate diet in his Second Amended Complaint.  (*See* Doc. 106 at 8.)  Even assuming that those claims were somehow encompassed in what Plaintiff did allege, Plaintiff has not shown that anyone has been deliberately indifferent to his medical needs with regard to an appropriate diet and has not shown that he was denied a medically-appropriate diet due to a policy of Defendants.

1    Plaintiff repeatedly argues that ADC employees' statements that ADC does not
2    offer a cardiac diet show that he is not provided a cardiac diet due to a policy of the ADC.
3    The evidence shows, however, that ADC employees, employees of Trinity, and
4    employees of Corizon have worked with Plaintiff to formulate an appropriate diet, even
5    though the ADC does not call the diet a "cardiac diet," and that Plaintiff has considered
6    those diets inadequate.  Although Plaintiff shows that he does not consider the ADC's
7    offerings adequate, he has not produced any evidence from any doctor showing that any
8    doctor believes that the diet Plaintiff is getting is inadequate or that the diets that have
9    been offered Plaintiff are inadequate. Under these circumstances, an Eighth Amendment
10   claim cannot lie.  *See LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993) (citation
11   omitted) ("The Eighth [and Fourteenth] Amendment[s] require[] only that prisoners
12   receive food that is adequate to maintain health.") (quoting *Hamm v. DeKalb County*, 774
13   F.2d 1567, 1575 (11th Cir. 1985)).  Plaintiff has not shown deliberate indifference with
14   regard to a heart healthy diet and has not shown that he has been denied a diet as a result
15   of a policy, practice, and custom of any of the named Defendants.

16   Because Plaintiff has not presented evidence to raise a disputed issue of material
17   fact that there was any constitutional violation as to his medical care, and has not
18   presented evidence showing that Defendants were involved in any policies, practices, or
19   customs that resulted in a violation of Plaintiff's constitutional rights, the Court will grant
20   Defendants' Motion for Summary Judgment.

21   **IT IS ORDERED:**

22   (1)    The reference to the Magistrate Judge is withdrawn as to Defendants'
23   Motion for Summary Judgment (Doc. 241).

24
25
26
27
28

1        (2)     Defendants' Motion for Summary Judgment (Doc. 241) is **granted**, and the

2  action is terminated with prejudice.  The Clerk of Court must enter judgment accordingly.

3        Dated this 2nd day of February, 2016.

 

 

David G. Campbell
United States District Judge